## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDWARD HAYES,<br>666 Ramapo Road,<br>Teaneck, NJ 07666 | )<br>)<br>)    CASE NO.: 1:25-cv-9333<br>) |
| Plaintiff, | )<br>) |
| v. | )    <u>JURY DEMAND</u><br>) |
| CAYUGA HOME FOR CHILDREN, INC.,<br>1916 Park Avenue,<br>New York, NY 10037 | )<br>)<br>)<br>) |
| *and* | )<br>) |
| ANDY LOPEZ-WILLIAMS,<br>11 Pippin Wood Drive<br>New Hartford, NY 13413 | )<br>)<br>)<br>) |
| *and* | )<br>) |
| ELAINE BUFFINGTON,<br>5566 Buck Point Road<br>Auburn, NY  13021 | )<br>)<br>)<br>) |
| *and* | )<br>) |
| BUFFINGTON & HOATLAND CPAs LLC,<br>213 North Street, Suite 1,<br>Auburn, NY 13021 | )<br>)<br>)<br>) |
| *and* | )<br>) |
| DANNIBLE & McKEE, LLP,<br>221 South Warrant Street #500,<br>Syracuse, NY 13202 | )<br>)<br>)<br>) |
| Defendants. | ) |

## **COMPLAINT**

Plaintiff Edward Hayes ("Hayes"), for his Complaint against Defendants Cayuga Home

for Children, Inc. ("Cayuga Centers"), Dr. Andy Lopez-Williams ("Lopez-Williams"), Elaine

Buffington ("Buffington"), Buffington & Hoatland CPAs, LLC ("B&H), and Dannible & McKee,

LLP ("D&M) (collectively, "Defendants"), hereby states as follows:

## NATURE OF THE ACTION

1.      This is an action to secure relief for Cayuga Centers' violations of rights guaranteed

by the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101; the Age

Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621-634; the Family and

Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601; the New York State Human Rights Law

("NYSHRL"), N.Y. Exec. Law § 290; the New York City Human Rights Law ("NYCHRL"), New

York City, N.Y., Code § 8-101, as well as related claims sounding under New York labor laws.

2.      In addition, this action asserts claims sounding in breach of contract against Cayuga

Centers and claims sounding in tort against all the Defendants.

3.      The ADA, NYSHRL, and NYCHRL prohibit employment discrimination on the

basis of disability, and the ADEA, NYSHRL, and NYCHRL prohibit employment discrimination

on the basis of age.  In addition, the ADA, ADEA, FMLA, NYSHRL, and NYCHRL each prohibit

employers from retaliating against an employee for exercising his or her rights under those statutes

or opposing acts and practices that are made unlawful by those statutes.

4.      Defendant Cayuga Centers discriminated and retaliated against Plaintiff Hayes

after he contracted a disease on a work-related trip that resulted in the amputation of his arm.

Hayes, the President and CEO of Cayuga Centers since 1995, was instrumental in building Cayuga

Centers into what it is today.  Despite decades of hard work and invaluable contributions to Cayuga

Centers, in the weeks following Hayes's operation, the commencement of his FMLA leave, and

his worker's compensation claim, the Board of Trustees for Cayuga Centers (the "Board") — in

particular, the Board chairperson, Lopez-Williams — initiated a campaign to push Hayes out of

19596345

the organization and tarnish his reputation, ultimately resulting in the early termination of Hayes's employment contract. The various reasons cited by the Board and Lopez-Williams for their mistreatment of Hayes are either false or relate to matters that were well-known and authorized by Cayuga Centers and the Board for years *before* Hayes's amputation surgery and termination. As such, the eleventh-hour accusations made against Hayes are pretextual and intended to cover up a discriminatory and/or retaliatory animus.

5.      The efforts by the Board and Lopez-Williams to defame Hayes and tarnish his reputation were bolstered and assisted by Cayuga Centers' longtime accountant, Defendant Buffington. Buffington was employed by Defendant B&H until B&H was acquired by D&M in late 2022; since then, Buffington has been employed by D&M. In or around late-2024 to early-2025, Buffington issued audit reports and statements to the Board and/or Lopez-Williams falsely suggesting Hayes engaged in improper practices with respect to Cayuga Centers' use of federal funds, when those exact same practices had been fully disclosed to *and approved by* Buffington herself (and by extension, B&H) for almost a decade before the smear campaign against Hayes began. Upon information and belief, Buffington's sudden change of position was prompted by the acquisition of her prior accounting firm, B&H, by D&M in 2022, and improper pressure by Lopez-Williams and Cayuga Centers rather than any legitimate change in the law and/or Cayuga Centers' practices or policies.

6.      In addition to its violations of the ADA, ADEA, FMLA, NYSHRL, and NYCHRL, Cayuga Centers breached the terms of Hayes's Employment Contract by (i) terminating his employment early and without good cause; (ii) failing to abide by other contract terms providing protections to Hayes from overreach by the Board; and (iii) refusing or failing to pay Hayes compensation that was owed to him under the Employment Contract.

19596345

7. Cayuga Centers is also liable for violations of the New York State labor laws due to its failure to pay wages or benefits that are still due and owing to Hayes. Further, Defendants are liable to Hayes for the torts of defamation, intentional infliction of emotional distress, and tortious interference due to their egregious course of conduct giving rise to this litigation.

## PARTIES, JURISDICTION, AND VENUE

8. Plaintiff Hayes is an individual currently residing in Bergen County, located in the state of New Jersey. When the relevant events transpired, Hayes was a resident of Cayuga County, New York.

9. Defendant Cayuga Centers is a not-for-profit organization with a principal place of business in the state of New York and two principal administrative offices located in New York City and Auburn, New York.

10. Defendant Andrew Lopez-Williams is an individual residing in Oneida County, located in the state of New York.

11. Defendant Elaine Buffington is an individual residing in Cayuga County, located in the state of New York.

12. Defendant B&H was a limited liability company operating in Cayuga County, New York up until such time as it was acquired by Defendant D&M in or around November 2022.

13. Defendant D&M is a limited liability partnership operating in Onandanga County, New York.

14. Cayuga Centers, at all times relevant, was Hayes's employer as defined in the ADA, 42 U.S.C. § 12111(5); ADEA, 29 U.S.C. § 630(b); FMLA, 29 U.S.C. § 2611(4)(A), NYSHRL, N.Y. Exec. Law § 292; and NYCHRL, New York City, N.Y., Code § 8-102.

4

19596345

15. The Court has subject matter jurisdiction over Plaintiff's federal claims arising under the ADA, ADEA, and FMLA pursuant to 28 U.S.C. § 1331.

16. The Court further has supplemental jurisdiction over Plaintiff's state law tort, contract, and statutory claims under 28 U.S.C. § 1367(a).

17. The Court possesses specific personal jurisdiction over Cayuga Centers, because Cayuga Centers operates offices in this District and Hayes was employed by Cayuga Centers in this District at the time when Cayuga Centers terminated his employment for discriminatory and retaliatory reasons. For like reason, this Court has personal jurisdiction over Lopez-Williams, Buffington, B&H, and D&M as they are all individual or corporate residents of the state of New York who were involved in this misconduct.

18. Venue is proper under 28 U.S.C. § 1391 because the acts giving rise to Plaintiff's claims took place in this District and Plaintiff was employed in Cayuga Centers' New York City office at the time when his employment was unlawfully terminated.

## SATISFACTION OF STATUTORY PREREQUISITES

19. On or about June 2, 2025, Hayes filed a Charge of Discrimination against Cayuga Centers with the United States Equal Employment Opportunities Commission ("EEOC"), which receives and investigates charges of discrimination under the ADA, ADEA, and FMLA. **Exhibit A**.

20. While Hayes was awaiting a right to sue letter from the EEOC, the United States federal government shut down in the early morning of October 1, 2025 after Congress failed to pass funding for federal programs and services. This shut down, the longest in U.S. history, is still ongoing and as a result, the EEOC is closed because of a lapse in its appropriation. There has been

5

19596345

no reliable indication of when this shutdown will end and/or the EEOC will resume its normal operations.

21.     Furthermore, under the ADEA, a plaintiff can file a lawsuit in court any time after 60 days have passed from the day you filed your charge (but no later than 90 days after receiving notice that the EEOC's investigation is concluded).[1]  ADEA plaintiffs do not need to wait for the EEOC to issue a Notice of Right to Sue in order to proceed in court.

22.     Accordingly, Hayes files his lawsuit at this time, although he has not yet received a Notice of Right to Sue from the EEOC.  Hayes anticipates that the EEOC will issue a Notice of Right to Sue upon the resumption of its operations, as five months have already passed since Hayes submitted his charge to the EEOC.

## STATEMENT OF FACTS

23.     This lawsuit arises from the former employment relationship between Hayes and Cayuga Centers and the unlawful termination thereof by Cayuga Centers effective June 2025.

### Hayes's Long and Impressive Tenure with Cayuga Centers

24.     At the time of his unlawful termination, Hayes had worked for Cayuga Centers for almost three decades, serving as its President and CEO (his previous title was Executive Director) since 1995.  He is currently 73 years old, but was 72 when the relevant events occurred.

25.     Through his excellent leadership over the past three decades, Hayes transformed Cayuga Centers into what it is today.  When Hayes assumed leadership of the organization, Cayuga Centers was on the road to closure (as was common at the time with small congregate care providers). In the time since, through his innovation, ingenuity, and evidence-based practice,

---

[1] https://www.eeoc.gov/filing-lawsuit.

19596345

Hayes turned Cayuga Centers into a thriving, impactful organization with a national imprint. Cayuga Centers operates in New York, Illinois, California, and Florida.

26.     In addition to driving Cayuga Centers' organizational and operational focus, Hayes served as the public face of the agency.  In that role, Hayes was heavily involved — and highly successful — in fundraising and building awareness of Cayuga Centers and its mission.

27.     With some minor exceptions, prior to the events that led to this litigation, neither Cayuga Centers nor its Board expressed any material concerns regarding Hayes's leadership and his stewardship over Cayuga Centers' operations and finances.

**The Board Attempts to Interfere with
Hayes's Employment Contract in Mid-2024**

28.     By the plain language of Hayes's operative Employment Contract dated November 14, 2012 (**Exhibit B**), in particular § 4, June 30, 2019 was the ending date of the Contract term; *provided, however*, that "on June 30th of every even year in this agreement, this ending date will [be] extended by two years, unless the Board — prior to that date — votes not to extend." Accordingly, on each even-yeared June 30th during that term — *i.e.*, June 30, 2014, 2016, 2018, 2020, 2022, and 2024 — two years, or twelve years in total, were added to the original ending date of June 30, 2019.

29.     As such, the operative ending date of the Employment Contract was *June 30, 2031*, subject to the exceptions in §§ 3, 11, 14, and 15 (which are inapplicable).

30.     Despite this, in June 2024, the Board (as then constituted) sent a letter of twelve-months' notice of nonrenewal to Hayes (the "First Nonrenewal Letter").  **Exhibit C.**  While Lopez-Williams and prior Board chairs have always taken the position that Board actions must be minuted to be valid, Cayuga Centers' minutes contain no record of the Board authorizing the sending of

7

the First Nonrenewal Letter and, upon information and belief, a full Board vote never took place. There is also no record of the Board deciding *not to* automatically extend Hayes's Employment Contract to June 30, 2031, as required in the automatic extension clause.  Because not reflected in the minutes, any acts by the Board that were intended to disrupt Hayes's Employment Contract were not duly authorized.

31.     Upon information and belief, the impetus behind the First Nonrenewal Letter (and its erroneous claim that the Employment Contract's term expired June 30, 2025) stemmed from an incorrect and retaliatory interpretation of the agreement by Cayuga Centers' prior outside counsel, after the previous Board chair ordered Hayes to terminate the employment of now-interim CEO of Cayuga Centers, Lorraine Sanchez, an effort which Hayes strongly opposed.

32.     Hayes's resistance to the plan led the former Board chair and outside counsel to verbally threaten Hayes's employment, but following a full  investigation, Sanchez was cleared of any wrongdoing. The prior Board chair and outside counsel thereafter ceased or diminished their relationships with Cayuga Centers. There was never a Board minute adopting the prior counsel's radical and retaliatory reinterpretation of Hayes's Employment Contract, so it was never officially approved.

33.     Following these events, J.C. Polanco ("Polanco"), the Board's vice chair, took over as interim Board chair.  Lopez-Williams was elected to be Board chairperson the next month.

**Lopez-Williams and the Board Start Negotiating
A New Employment Contract with Hayes**

34.     While Polanco was still serving as interim chair, Hayes initiated communications with the Board regarding a new Employment Contract.  This was intended as an olive branch to

8

the Board following the dispute over the Employment Contract's term.  Once Lopez-Williams was elected, he took over that process from Polanco.

35.     While it is Hayes's position that the Employment Contract extended through June 2031, in the spirit of compromise, he proposed that the parties discuss a new Employment Contract in lieu of continuing to operate under the existing agreement. The Board was amenable to this proposal, going so far as to form a Contract Negotiating Committee and Succession Planning Committee (later merged) to explore this option.

36.     On November 20, 2024, Hayes received an email from Lopez-Williams confirming that "…a work group related to the development of a new contract for [Hayes] as CEO/President was approved by the Board and initiated in October 2024. We want to ensure [Hayes] of our intent as a Board to utilize this work group to discuss the framework for a new contract and negotiate with you in good faith.  Please note this is a priority and it is our intent and hope to move forward as efficiently as possible in this matter." **Exhibit D.**

37.     The contract discussions continued through 2024 and into early-2025.  At no point during this period did the Board suggest it did not intend to renegotiate the Employment Contract or abide by its existing terms.

**Hayes Becomes Disabled Due to an Infection
Contracted on a Work Trip in Early-2025**

38.     On January 22-23, 2025, Hayes went on a work trip for Cayuga Centers.  While on this trip, Hayes contracted a very serious infection known as necrotizing fasciitis.

9

19596345

39.     As a result of this infection, Hayes's arm was amputated on January 25, 2025.  In the time following his surgery, Hayes has been in recovery and on medical leave.  While initially on FMLA leave, Hayes continued to perform his responsibilities for Cayuga Centers.

40.     While Hayes's amputation clearly constitutes a disability within the meaning of the ADA, with reasonable accommodations by Cayuga Centers, Hayes easily could have continued to perform his duties as the President and CEO of Cayuga Centers, such as fundraising and decision-making for the agency.  Quite simply, Hayes's role and responsibilities did not include physical components that would have been impeded by his disability.  Hayes was already using a driver, at Cayuga Centers' instruction, so that he could work for the agency while on the road.

41.     Nevertheless, at no point in time did Cayuga Centers or the Board offer reasonable accommodation to Hayes, although Hayes expressed his desire to return to work with appropriate accommodation.  Moreover, Lopez-Williams's demeanor and behavior towards Hayes changed markedly after his disability arose.

### Lopez-Williams Immediately Initiates a
### Campaign to Oust and Defame Hayes

42.     Following Hayes's disability, negotiations relating to a new Employment Contract ceased.  A Board Meeting was then held on February 26, 2025 (the "February 26, 2025 Meeting").  Hayes planned to attend the Meeting and communicated that to Lopez-Williams and the Board, as was his consistent practice, but Lopez-Williams instructed Hayes not to attend this Meeting.  Among other things, Hayes later learned that his disability — and ability to continue working in light of his age and physical condition — were heavily discussed by the Board during the February 26, 2025 Meeting.  This is additional evidence of the Board's discriminatory intent towards Hayes.

19596345

43.    Worse yet, on February 27, 2025 — not 32 days after Hayes's surgery — Lopez-Williams, *ostensibly* on behalf of the Board[2], sent Hayes a letter to "open discussions regarding the termination of your employment relationship" with Cayuga Centers (the "Second Nonrenewal Letter").  **Exhibit E.**  This was a drastic departure from the Board's position during the months immediately preceding Hayes's disability.  Upon information and belief, moreover, the Board only authorized Lopez-Williams to approach Hayes regarding a "dignified departure" from Cayuga Centers. Lopez-Williams ignored this instruction in sending the incendiary February 27, 2025 Letter.

44.    The February 27, 2025 Letter alleged, like the First Nonrenewal Letter, that Hayes's Employment Contract expired on June 30, 2025 — though this was decisively rebutted long before the Second Nonrenewal Letter was sent and the Board implicitly disavowed the First Nonrenewal Letter by engaging in employment negotiations with Hayes through late 2024 to early-2025.

45.    The Second Nonrenewal Letter further contained false, offensive, and defamatory accusations regarding Hayes's work as the President and CEO of Cayuga Centers.  Prior to Hayes's disability, neither the Board nor Dr. Lopez-Williams raised serious concerns regarding Hayes's job performance.  It was only after, when Hayes was on FMLA leave, that such concerns were raised and apparently debated outside of Hayes's presence.  The timing of the Board's sudden about face — and decision to raise heretofore unmentioned complaints about Hayes just a month after his disability arose — was highly suspect.

---

[2] As discussed below, there is reason to doubt the Board made an informed decision authorizing Lopez-Williams to take these steps against Hayes, at least as to some of them.  Discovery will show if, and to what extent, Lopez-Williams has acted within the scope of his authority.

11

46.     Specifically, the Second Nonrenewal Letter alleged that "significant concerns" had been escalated internally and by the external auditors — *i.e.*, Buffington and D&M — "regarding significant financial discrepancies and irregularities under [Hayes's] oversight, particularly over the past several years."

47.     The Letter claimed Hayes directed the use of federal funds to cover allegedly non-affiliated and underperforming programs at Cayuga Centers. The use of federal funding for other programs, always in a manner consistent with Cayuga Centers' mission, is widespread amongst similar not-for-profit organizations. Further, there can be no dispute that the way in which federal funds were used by Cayuga Centers was fully and transparently disclosed by Hayes to Buffington, the Finance Committee of the Board, and the Board as a whole for ***almost a decade***. Cayuga Centers' practices for using federal funds were frequently noted in reports to the Board and the Board minutes. All the audits during this time were clean opinions. The Board and Buffington, B&H, and D&M consistently approved of the practices without reservation for the entire time. Accordingly, the Board's and Lopez-Williams' decision to raise this issue for the first time immediately after Hayes became disabled is evidence of pretext.

48.     The Second Nonrenewal Letter also placed blame solely on Hayes's shoulders for an alleged shortfall in Cayuga Centers' funding — a claim the Board has refused to substantiate, despite multiple requests by Hayes and counsel. It is common sense that any such shortfall, if it exists, would be due to a multitude of factors, such as the highly publicized changes in the allocation of federal funds under the current Administration. Further, in the past, Hayes had been frequently ***praised*** by the Board and its chairperson for his entrepreneurial and expansive approach to Cayuga Centers' budget and operations.

19596345

49.     Finally, the Second Nonrenewal Letter speciously alluded to Hayes's "fail[ure] to follow the Organization's internal controls, specifically designed to prevent such financial issues." No explanations or examples were given to substantiate this vague and unsupportable accusation.

50.     Due to these spurious claims, the Board alleged it had the right to terminate Hayes's Employment Contract before its natural term ended (a date the Board, somewhat inexplicably, also disputed in the same Letter).  The Board cited § 11 of the Employment Contract as grounds for the early termination for cause.

51.     The Second Nonrenewal Letter purported to fulfill § 11's requisite 60-day notice requirement by vaguely alluding to "financial irregularities that have been raised, particularly by the external auditors [*i.e.*, Buffington and Rowe]."  Lopez-Williams claimed he had "no choice but to consider a full forensic audit of the Organization to ensure full compliance will our fiduciary and regulatory obligations."  Again, despite multiple follow-ups, Lopez-Williams and the Board have never provided evidence that such an audit was conducted after Lopez-Williams began this smear campaign against his recently disabled colleague.  Hayes is not aware of any negative action taken by the Department of Health and Human Services (HHS), or the federal government more broadly, against Cayuga Centers in relation to these accusations.

52.     The Letter offered the following terms to Hayes:

- You would be placed on administrative leave, with pay and continued benefits, beginning immediately through June 30, 2025.
- We expect that you would be available on an as-needed basis only, to ensure a smooth transition to a new leader.
- We would follow a collaborative approach in drafting and communication of the messaging around your exit from the Organization in a way that supports your legacy, though the Board has the final approval of any and all messaging.
- Upon your separation of employment, the Board authorizes a severance package equal to your current salary and benefits from July 1, 2025 through December 31, 2025.

19596345

53.     While Lopez-Williams indicated the above terms were an "offer", he ended the Second Nonrenewal Letter by telling Hayes that his second-in-command, Lorraine Sanchez, would be taking over all "day-to-day operations including, but not limited to, financial oversight and operations of the Organization" effective immediately.  Hayes's access to his computer and email was cut off immediately as well.  Despite this demotion and Hayes's current FMLA leave status, Hayes was admonished by Lopez-Williams that he must continue to "work collaboratively with Lorraine on an as-needed basis", although he paradoxically encouraged Hayes to "continu[e] to pursue any leave, paid or unpaid, to which you may be entitled."  Finally, it appears Hayes's leave was reclassified by Cayuga Centers from FMLA leave to administrative leave at this time.

54.     Lopez-Williams concluded the Second Nonrenewal Letter on an ominous note: "***The Board thanks you for your service***."  It was clear that at least Lopez-Williams, if not the entire Board, had already decided that Hayes's time with Cayuga Centers was over — just ***one month*** after his disability arose, after almost ***thirty years*** of tireless work in which Hayes built Cayuga Centers into what it is today.

55.     Unfortunately, after Hayes opposed this blatant discriminatory treatment clearly tied to his age and perceived inability to perform his work because of the amputation of his arm, the conduct of the Board — aided by Lopez-Williams, Buffington, and D&M — grew even more malicious.

### Hayes Opposes the Termination of His Employment Contract, And the Board Maliciously Retaliates

56.     After receiving the Second Nonrenewal Letter, Hayes had no choice but to retain counsel.  Through counsel, Hayes responded to the spurious Second Nonrenewal Letter on March

14

19596345

21, 2025 (the "First Rebuttal").[3] **Exhibit F.**

57.    The First Rebuttal disputed each accusation of the Second Nonrenewal Letter:

a.  It rebutted Lopez-Williams's misguided claim that the term of the Employment Contract ended on June 30, 2025, as discussed *supra*.

b.  As to the "significant financial discrepancies and irregularities" with respect to federal grant money, the letter explained that Cayuga Centers' practices were approved by Buffington and B&H for *nine years*, and were disclosed to Cayuga Centers' treasurer, Richard Barbieri, the Finance Committee, as well as the full Board.  Among other documents, the 2024 CEO Report to the Board specially set out how Cayuga Centers utilized federal funding to ameliorate deficits in other programs.  Cayuga Centers' practices were consistently approved through all the appropriate channels.  It was only after B&H was acquired by D&M in late 2022 that concerns were first raised regarding such practices.  Accordingly, there was no financial mismanagement whatsoever and federal funds were used, at all times, to directly support the mission of Cayuga Centers, help those in need, and fund growing programs to serve the maximum number of people.  No funds were ever diverted by Hayes for personal or improper purposes.

c.  Hayes disputed whether the Second Nonrenewal Letter had been approved by the Board as a whole or was a rogue action by Lopez-Williams.  When Hayes shared the Second Nonrenewal Letter with the entire Board, several members expressed shock and dismay over the Lopez-Williams's insulting tone and misrepresentations.  Thus, it appears the Second Nonrenewal Letter, as written, was not agreed to by the Board at the February 26, 2025 meeting.  Instead, it seems the Board only directed Lopez-Williams to send a letter *respectfully* continuing discussions as to Hayes's contract — *not* the aggressive, accusatory Second Nonrenewal Letter threatening a termination the Board never approved, sent to insult Hayes, Cayuga Centers' highly valued long-term leader who recently suffered a major health event and permanent disability while performing his job duties.

d.  Hayes further pointed out that he was not permitted to attend the February 26, 2025 Meeting, despite requesting to attend[4], although it was the normal practice of Cayuga Centers for Hayes to be present during Board meetings.  Hayes also was not informed that (i) the Meeting was called to discuss his age/physical condition and the recent audit by Buffington and D&M, or that (ii) it was to be attended by outside counsel, who started the meeting by stating a case against Hayes and calling for an immediate vote on his termination.  Both agenda items violate the law and the terms of Hayes's Employment Contract dealing with attempts at adverse action

---

[3] At this point and going forward, all relevant correspondence was through the parties' respective counsel.
[4] Although Hayes was not yet fully healed, he requested to be present at the Meeting so that he could show the Board his recovery progress and that he was still capable of running the agency.

by the Board (§ 11). Last, per the minutes from the February 26, 2025 Meeting, the Board did not vote to place Hayes on administrative leave (rather than FMLA leave) or terminate his employment.

58. The First Rebuttal concluded by admonishing the Board that its actions "breached his Employment Contract and constituted wrongful discharge, as well as illegal discrimination on the basis of Hayes's age and disability in violation of Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.*, the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*, and related state law, retaliation under the FMLA and worker's compensation laws, and defamation.

59. The distinct shift in the Board's treatment of Hayes following his disability also threatened his recovery and significantly added to the mental distress, pain, and anguish caused by his traumatic medical event. Hayes's surgeon opined that the stress caused by this mistreatment impaired the healing of Hayes's skin grafts, based on research studies showing that stress can have a strong deleterious effect on the success of tissue regrowth. Hayes's job stress and resulting harm to the skin grafts ultimately forced Hayes to undergo three additional surgeries as well as a regime of intensive antibiotic treatments, further exacerbating his pain and suffering.

60. The severance offered to Hayes in the Second Nonrenewal Letter was also far less than that paid to employees of much shorter tenure, including those who engaged in conduct that was actively detrimental to Cayuga Centers and its mission, unlike Hayes. This disparate treatment of Hayes is still more evidence of Cayuga Centers' discriminatory and/or retaliatory animus.

61. Despite the First Rebuttal's warnings, Lopez-Williams and the Board escalated, rather than ceased, their campaign against Hayes after it was sent. Hayes's access to his computer and emails was not restored; rumors regarding his physical condition and job performance continued to swirl; the accusations regarding financial mismanagement were not recanted; and the

16

19596345

Board took other steps to alienate Hayes from Cayuga Centers, such as revoking access to his company car and driver despite knowing Hayes could no longer drive and had many medical appointments to attend.

62.    Upon information and belief, Defendants also spread false and defamatory rumors (or caused them to be spread) within the Auburn, New York community, where Cayuga Centers holds one of its principal offices and Hayes was then a resident and prominent local figure.

### The Board Executes Hayes's Termination

63.    On April 11, 2025, the Board sent Hayes a letter purporting to set forth grounds for the early termination of his Employment Contract (the "Unlawful Termination Letter"). **Exhibit G.**

64.    The Unlawful Termination Letter reiterated those prior false accusations against Hayes, and also added new — totally unsubstantiated — accusations regarding his practices as the President and CEO of Cayuga Centers.  Among other things, the Unlawful Termination Letter falsely claimed that:[5]

    a.   The purported mismanagement of federal funds resulted in an HHS investigation of Cayuga Centers.  Of note, there is no evidence that HHS has taken any adverse action against the organization.

    b.   The federal funds issue and other practices allegedly directed by Hayes led to a shortfall in Cayuga Centers' budget for 2023.  This claim was not substantiated by any evidence, such as a budget report.

    c.   Hayes caused the audit of Cayuga Centers' accounting records to be delayed for unspecified reasons, resulting in Cayuga Center's banking partner rescinding its line of credit.

    d.   Cayuga Centers was forced to lay off 200 employees due to budgetary shortfalls allegedly caused by Hayes.

---

[5] To be clear, Hayes strongly disputes all these accusations, as discussed further in paragraph 66 *infra*.

17

    e.  Hayes authorized Cayuga Centers to pay for a vehicle and a driver for his wife, for her personal use, in addition to the car and driver provided to Hayes.  Hayes's wife was purportedly given access to the organization's credit card for her own personal use.

    f.  Hayes took lavish trips in 2024, including to Nashville and New York City, staying at the Conrad line of hotels.  Per the Unlawful Termination Letter, these trips had no legitimate business purpose.  Hayes also allegedly used Cayuga Centers' funds to pay for pricey restaurant meals and Uber charges.

    g.  Hayes wastes agency resources by regularly staying in hotels while in New York City, despite living in New Jersey at that time.

    h.  Hayes does not submit his business expenditures for reimbursement with sufficient back-up information to justify the expenses.

    i.  Hayes failed to keep the Board fully apprised of the above circumstances.

As with the Second Nonrenewal Letter, *none* of the above Board complaints had been raised with Hayes prior to his medical incident and disability in early-2025 — further proof of pretext.

65.    The Unlawful Termination Letter gave Hayes two weeks, until April 25, 2025, to respond to the above accusations in writing.  The Letter made clear that Hayes would not be permitted to address the Board in person regarding the termination of his Employment Contract, although that was required under § 11.

66.    After receiving the Unlawful Termination Letter, Hayes's counsel reached out to the attorney for the Board via email on April 17, 2025 to request certain records needed to fully respond to the Board's accusations.[6]  **Exhibit H.**  The email also explained why it was required and necessary for Hayes to address the Board members in person before any vote occurred on the

---

[6] These records included:

1. Board Meeting Minutes for the last decade
2. The HHS letter dated 4/8/25 referred to in the 4/11/25 letter
3. Monthly Board Updates for the last decade
4. Monthly CEO Reports for the last decade
5. The audit for the period ending June 30, 2023

19596345

early termination of his Employment Contract. The Board's attorney refused to provide the documents requested by Hayes, except for the HHS letter, and reaffirmed that Hayes would not be permitted to attend the Board meeting or speak to Board members.

67. Nevertheless, Hayes responded to the Board on the requested deadline of April 25, 2025, once more rebutting the false and offensive allegations against him (the "Second Rebuttal"). **Exhibit I.** Hayes stressed that — contrary to the fanciful depictions in the Unlawful Termination Letter — the Hayes family lived in a modest home, their primary vehicle is over twelve years old, and he worked tirelessly for the benefit of Cayuga Centers, including almost every weekend and holiday, often expending personal funds for agency costs for which he sought no reimbursement.

68. The Second Rebuttal also addressed the Board's latest round of spurious claims:

a. The Board's characterization of the April 8, 2025 HHS audit letter was overblown and misleading. The Board was promptly informed by Hayes when HHS asked for information in September 2024. Additionally, the April HHS letter did ***not*** find misconduct by Cayuga Centers and mainly addressed the timing of the drawdowns and the availability of certain records. Further, HHS states only that "further review into Cayuga's drawdown process…is necessary" and sought supplemental records. At worst, the April HHS Letter proves HHS was investigating, not that wrongdoing had been found. Indeed, the monetary values of Cayuga Centers' federal contracts were ***increased*** at or around this time.

b. Hayes's recollection was that the 2023 audit reported a deficit of about $5 million (Hayes was not provided with a copy of the audit to check his recollection), and he timely reported that to the Board. It was unclear how the Board got the idea that Hayes previously reported a loss of only $1 million. Further, Hayes could not have reported the results of the final audit for 2024 to the Board, as that audit is still incomplete according to the Board.

c. With respect to the layoffs, Hayes long knew that layoffs were needed, which he discussed with the Board. On information and belief, Board member Peter Ranelli ("Ranelli") assisted Lopez-Williams in conducting the layoffs after Hayes's surgery. Before his amputation, Hayes had asked Ranelli to give him a written report with his recommendations for the layoffs. After the amputation surgery, Ranelli cancelled all his meetings with Hayes and collaborated instead with Lopez-Williams in conducting the layoffs. The subsequent inept handling of the layoffs by Ranelli and Lopez-Williams led to employees being terminated needlessly and

19

19596345

bad publicity for Cayuga Centers. If Hayes had been permitted to participate, with his far superior understanding of the issues and solutions, the impact of the layoffs could have been lessened. The extent of the layoffs was also exacerbated by the Board's refusal to permit Hayes to engage in fundraising efforts at this time.

d. Hayes's daughter, not Hayes himself, lived in New Jersey at the time.[7] At the time of writing, Cayuga Centers required Hayes to maintain a residence in Auburn, New York (a five hour-plus drive to New York City). Hayes would often sleep in his daughter's basement guest room to save costs on hotels, when it was available. The use of Conrad hotels by Hayes was at the suggestion of the then-current Board chair, in around 2016, and the subsequent Board chairs consistently approved these expenditures. If the Board was concerned about the costs, it could have removed the requirement that Hayes reside in the Auburn school district, which would have eliminated the need for hotel stays and restaurant meals in New York City. Hayes had to regularly travel to New York City for work, as that is where one of Cayuga Centers' main offices was located.

e. The trip to Nashville was for business and fundraising purposes, was approved by Lopez-Williams ahead of time, and any expenditures for non-work purposes were paid for with the Hayes's own funds, not the funds of Cayuga Centers. Hayes had traveled to Nashville annually over the past few years, on Cayuga Centers business, so that he could meet with futurists and important players in the not-for-profit field. The Board has given no evidence or examples of improper expenditures on this trip to Nashville by Hayes or the past trips, which were all approved.

f. The charges in Hayes's expense reports were proper, accurate, and had been approved without fail by the Board — without request for additional information or documentation — for many years. Expensive restaurant bills and tickets were for large meals and events with staff, consultants, Board members, donors, and potential donors. Fundraising was one of Hayes's main duties as the CEO of Cayuga Centers. At no point prior to the Unlawful Termination Letter had the Board raised concerns about Hayes's expenses or expense reports. In addition, the way in which Hayes submitted his expenses was at the instruction of the former Board chair and was sanctioned by Buffington since around 2009.

g. Cayuga Centers never purchased a car for Hayes's wife, nor did she use the agency's credit card for personal expenses. Those accusations are blatantly false. For decades, Hayes's wife, Ms. Myers, had helped with fundraising, entertaining donors and staff, organizing events, and counseling staff, all with no compensation whatsoever. The Board authorized Ms. Myers to travel with Hayes in § 12 of his

---

[7] Although Hayes now lives in New Jersey, he moved there after he was placed on administrative leave by Cayuga Centers. While still actively employed, Hayes always maintained a residence in New York, as he was required to do by Cayuga Centers. It is inexplicable that the Board appears to have forgotten this requirement.

20

Employment Contract, and a credit card in her name saved Cayuga Centers the cost of baggage and airport lounge fees and allowed her to help with fundraising without having to personally front the expenses (note, the credit card in question is a Delta Amex used specifically to avoid travel fees). Lopez-Williams was approving these expenses all along, moreover.

69. The Second Rebuttal concluded by admonishing and warning the Board, yet again, that the suspicious "timing of the Board's vendetta against Hayes alone — coming immediately at the heels of his recent disability, though the alleged conduct by Hayes was authorized by the Board for many years — is compelling evidence of discrimination on the basis of disability and age."

70. On May 1, 2025, Hayes was given 61-days' notice of the early termination of his Employment Contract by the Board. The final date of his employment would be June 30, 2025. In the meantime, he would remain on administrative rather than FMLA leave.

71. Cayuga Centers also cut off Hayes's healthcare coverage immediately on June 30, despite knowing he was receiving ongoing medical treatment for his amputation, and did not give him an opportunity to enroll for coverage under COBRA ahead of time. This caused significant additional delay and inconvenience to Hayes and his family during this trying time.

**Defendants *Continue* to Retaliate Against and Defame Hayes**

72. Even after Hayes's employment by Cayuga Centers was terminated, Defendants continued their misconduct towards Hayes.

73. Despite Hayes's ongoing health struggles, including a bone infection at the site of his skin graft due to, or exacerbated by, the extreme stress caused by Defendants, Cayuga Centers continued to pepper Hayes with demands to return alleged organization property or clear out personal items belonging to Hayes. None of these matters were urgent, but Cayuga Centers refused to delay resolution at a time when Hayes was preparing for a second surgery to address the infection caused, or exacerbated, by Defendants' misconduct.

21

19596345

74.     Upon information and belief, defamatory rumors and misstatements also continued to be spread about Hayes by the Defendants.

75.     Last, Cayuga Centers has refused or failed to pay wages and other benefits due to Hayes, such as his accrued PTO, despite multiple requests.  This compensation has been due and owing since shortly after Hayes's employment terminated in June 2025, but still has not been paid to Hayes as of the date of filing in violation of New York's labor laws.

76.     Due to the collective and individual misconduct of Defendants, as described above, Hayes suffered lost wages and other economic harm, as well as severe emotional distress and pain and suffering.  Defendants are liable for those damages.

**COUNT I:**
**ADA – DISCRIMINATION (42 U.S.C. § 12112)**
**(Cayuga Centers)**

77.     Hayes hereby incorporates and repeats the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

78.     The ADA provides, in relevant part, that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  *See* 42 U.S.C. § 12112(a).

79.     Cayuga Centers is an employer subject to the ADA, as that term is defined in 42 U.S.C. § 12111(5).

80.     Hayes was disabled within the meaning of the ADA.  Due to the amputation of his arm, he has been substantially limited with respect to one or more major life activities, including without limitation, driving and operating other forms of tools or machinery that require the use of two hands and/or carrying certain larger items.

22

19596345

81.     Despite his disability, Hayes is qualified to perform the essential functions of his job.  Hayes's primary job functions consisted of fundraising, participating in meetings and calls regarding Cayuga Centers, and determining strategies for the agency.  All these functions could still be performed by Hayes with little to no accommodation by Cayuga Centers.  Hayes had already been assigned an agency vehicle long before his disability arose.

82.     As a direct result of his disability, Hayes suffered adverse employment actions, including being placed on administrative leave and eventually terminated.  Moreover, the reasons proffered by Cayuga Centers for its treatment of Hayes were false and pretextual and designed to cover up Cayuga Centers' discriminatory animus against Hayes in the wake of his disability.

83.     Cayuga Centers' violations of the ADA § 12112 have caused Hayes both economic harm and significant physical and emotional distress.

## COUNT II:
## ADA – RETALIATION (42 U.S.C. § 12203)
### (Cayuga Centers)

84.     Hayes hereby incorporates and repeats the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

85.     Pursuant to § 12203 of the ADA, "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter." *See* 42 U.S.C. § 12203(a).

86.     Hayes is disabled within the meaning of the ADA and was able to perform all his essential job functions with reasonable accommodation.  Hayes informed Cayuga Centers that he was ready, willing, and able to continue work even as his convalescence was ongoing, and he initiated communications regarding what, if any, reasonable accommodation(s) were needed to achieve this goal.  These are all protected activities under the ADA.

23

19596345

87.     Cayuga Centers, via the Board and Lopez-Williams, was well-informed that Hayes was engaging in those protected activities at all times relevant.

88.     Rather than engaging in a discussion with Hayes to determine the extent to which his disability affected his ability to perform essential job functions — and what reasonable accommodation(s) may be needed — Cayuga Centers placed Hayes on a punitive administrative leave just one month after his disability arose, immediately cut off access to his computer and emails, and terminated his Employment Contract long before the expiration of its term.

89.     A causal connection exists between Hayes's protected activities and the adverse actions by Cayuga Centers.  Prior to Hayes's disability and related actions, Cayuga Centers was negotiating an amended Employment Contract with Hayes in which he would stay employed for at least a few more years (and his existing Employment Contract ended in June 2031).  Almost immediately after Hayes became disabled and he sought reasonable accommodation from Cayuga Centers, all such negotiations ceased and Hayes was placed on administrative leave on false pretenses based on complaints and accusations raised for the first time.  His Employment Contract was terminated allegedly for cause soon thereafter.  Before his disability and related protected activities, no major criticisms of Hayes's performance had been communicated to him by the Board.  The Board's stark change of attitude and the temporal proximity to the onset of Hayes's disability are strong evidence of a causal connection between his disability and the retaliation by Cayuga Centers.

90.     Cayuga Centers' violations of the ADA § 12203 have caused Hayes both economic harm and significant physical and emotional distress.

24

19596345

**COUNT III:**
**ADEA – DISCRIMINATION (29 U.S.C. § 623)**
**(Cayuga Centers)**

91.     Hayes hereby incorporates and repeats the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

92.     Pursuant to § 623 of the ADEA, it shall be unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." *See* 29 U.S.C. § 623(a).

93.     Hayes is a member of the protected class, *i.e.*, an employee of Cayuga Centers over 40 years of age.

94.     Hayes is obviously qualified for his role as President and CEO of Cayuga Centers, having successfully served in that capacity since 1995.

95.     Hayes suffered an adverse employment action, *i.e.*, being placed on administrative leave by Cayuga Centers and his Employment Contract was terminated before the expiration of its term in June 2031.

96.     Many aspects of Hayes's termination and other mistreatment by Cayuga Centers give rise to an inference of age discrimination.  The combination of Hayes's age (then 72, now 73) and recent disability played a key (if not exclusive) role in Cayuga Centers' decision to fire Hayes on specious grounds.  This is evidenced by the discussions at the February 26, 2025 Meeting, the highly suspect timing of the Board's decision, the Board's multiple false claims in the Second Nonrenewal Letter and Unlawful Termination Letter (the falsity of which is still more evidence of pretext), and the apparent belief of the Board and Lopez-Williams that Hayes could no longer

25

19596345

perform capably in his role due to his physical condition, health, and/or age. Lopez-Williams appeared especially uncomfortable with Hayes's age and condition.

97.     Cayuga Centers' violations of the ADEA § 623 have caused Hayes both economic harm and significant physical and emotional distress.

## COUNT IV:
## ADEA – RETALIATION (29 U.S.C. § 623)
### (Cayuga Centers)

98.     Hayes hereby incorporates and repeats the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

99.     The ADEA further makes it unlawful for an employer to retaliate against an employee for opposing the employer's discriminatory practices or participating in any investigation or proceeding under the ADEA. *See* 29 U.S.C. § 623(d).

100.     Hayes is a member of the protected class, *i.e.*, an employee of Cayuga Centers over 40 years of age.

101.     As set forth *supra*, Hayes vehemently opposed the unlawful practices of Cayuga Centers that were motivated by discriminatory animus against Hayes due to his age and perceived physical and mental condition. Hayes's opposition is a protected activity under the ADEA.

102.     Cayuga Centers, via the Board and Lopez-Williams, was well-informed that Hayes was engaging in protected activities under the ADEA at all times relevant.

103.     Due to Hayes's opposition of discriminatory treatment in violation of the ADEA, Cayuga Centers placed Hayes on a punitive administrative leave just one month after his disability arose, immediately cut off access to his computer and emails, and terminated his Employment Contract long before the expiration of its term.

26

19596345

104. A causal connection exists between Hayes's protected activities and the adverse actions by Cayuga Centers. Prior to Hayes engaging in these protected activities, Cayuga Centers was negotiating an amended Employment Contract with Hayes in which he would stay employed for at least a few more years (and his existing Employment Contract ended in June 2031). Following Hayes's opposition to Cayuga Centers' discriminatory conduct, he was placed on administrative leave on false pretenses based on complaints and accusations raised for the first time. His Employment Contract was terminated allegedly for cause soon thereafter. Before this, no major criticisms of Hayes's performance had been communicated to him by the Board. The Board's stark change of attitude and the temporal proximity to Hayes's protected activities are strong evidence of retaliation by Cayuga Centers.

105. Cayuga Centers' violations of the ADEA § 623(d) have caused Hayes both economic harm and significant physical and emotional distress.

## COUNT V:
## FMLA – INTERFERENCE (29 U.S.C. § 2615)
### (Cayuga Centers)

106. Hayes hereby incorporates and repeats the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

107. Pursuant to § 2615 of the FMLA, "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1).

108. Hayes is an eligible employee for the purposes of the FMLA. 29 C.F.R. 825.102. He has worked at Cayuga Centers for about three decades; Cayuga Centers has over 50 employees; the total number of employees employed by Cayuga Centers within 75 miles of Hayes's worksite

27

is not fewer than 50; and Hayes worked more than 1250 hours during the twelve-month period preceding his FMLA leave.

109. For like reason, Cayuga Centers was an employer as defined under the FMLA. 29 C.F.R. 825.102.

110. Hayes was entitled to leave under the FMLA due to his serious health condition, to wit: his infection and resulting amputation, which has required multiple surgeries, skin grafts, and a lengthy period for recovery. 29 C.F.R. 825.112(a)(3); 29 C.F.R. 825.113.

111. Hayes gave notice to Cayuga Centers of his intention to take intermittent FMLA leave immediately following his traumatic medical event.

112. Hayes was thereafter denied benefits by Cayuga Centers when it opted to instead place Hayes on *administrative* leave — based on false accusations of financial mismanagement and other misconduct — in lieu of his requested FMLA leave. The 60-days' termination notice sent to Hayes on May 1, 2025 confirmed that Hayes would remain on administrative rather than FMLA leave until his final date of employment, June 30, 2025. Adding insult to injury, during Hayes's erstwhile FMLA leave, he was instructed by Lopez-Williams to keep working to assist Lorraine Sanchez in taking over Hayes's CEO role against his wishes.

113. Due to Cayuga Centers' violations of the FMLA, Hayes is entitled to recover his lost wages and other compensation, interest at the prevailing rate, and liquidated damages equal to the sum of his lost wages plus interest. 29 U.S.C. § 2617(a)(1)(A).

## COUNT VI:
## FMLA – RETALIATION (29 U.S.C. § 2615)
### (Cayuga Centers)

114. Hayes hereby incorporates and repeats the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

28

19596345

115.    Pursuant to § 2615 of the FMLA, "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."  29 U.S.C. § 2615(a)(2).

116.    Hayes exercised his rights protected by the FMLA by taking leave due to a serious health condition.

117.    Hayes is obviously qualified for his role as President and CEO of Cayuga Centers, having successfully served in that capacity since 1995.

118.    Hayes suffered an adverse employment action, *i.e.*, being placed on administrative leave by Cayuga Centers and his Employment Contract was terminated before the expiration of its term in June 2031.

119.    Many aspects of Hayes's termination and mistreatment by Cayuga Centers and its Board give rise to an inference of retaliatory intent due to Hayes's decision to take FMLA leave. Although Hayes had been engaged in negotiations with the Board regarding a renewed Employment Contract starting in mid-2024 until the date of his medical incident, those discussions ceased immediately after Hayes took his FMLA leave.  In addition, the multiple false claims in the Second Nonrenewal Letter and Unlawful Termination Letter are further evidence of pretext.  Not only are many of the Board's claims outright false, but others relate to circumstances that existed for many years prior to Hayes's FMLA leave, but were never the subject of criticism by the Board until his FMLA leave began.  Thus, the suspect timing of the Board's decision and the false nature of its accusations strongly support a finding of pretext and retaliatory intent.

120.    Due to Cayuga Centers' violations of the FMLA, Hayes is entitled to recover his lost wages and other compensation, interest at the prevailing rate, and liquidated damages equal to the sum of his lost wages plus interest.  29 U.S.C. § 2617(a)(1)(A).

29

19596345

**COUNT VII:**
**NYSHRL & NYCHRL[8] – DISCRIMINATION**
**(N.Y. EXEC. LAW § 296 & NEW YORK CITY, N.Y., CODE § 8-107)**
**(Cayuga Centers)**

121.    Hayes hereby incorporates and repeats the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

122.    Pursuant to § 296 of the NYSHRL, it shall be an unlawful discriminatory practice "[f]or an employer or licensing agency, because of an individual's age, race, creed, color, national origin, citizenship or immigration status, sexual orientation, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or status as a victim of domestic violence, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."  NYSHRL § 296(1)(a).

123.    Likewise, pursuant to § 8-107 of the NYCHRL, "it shall be an unlawful discriminatory practice: (a)  For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, sexual and reproductive health decisions, sexual orientation, uniformed service, height, weight, or immigration or citizenship status of any person….(2) To refuse to hire or employ or to bar or to discharge from employment such person."  NYCHRL § 8-107(1)(a)(2).

124.    Hayes is a member of a protected class due to his age and recent disability.

---

[8] Because the elements of discrimination claims under both laws are the same (*Garraway v. Solomon R. Guggenheim Found.*, 415 F. Supp. 2d 377 (S.D.N.Y. 2006)), they are pleaded together for the sake of brevity.

19596345

125. Hayes served successfully as the President and CEO of Cayuga Centers since 1995 and was only subject to major criticism after his disability arose. Hayes was also instrumental in turning Cayuga Centers into the impactful organization it is today and promoting the mission of Cayuga Centers to raise awareness and funding. The current criticisms of Hayes are outright false and/or highly misleading.

126. Hayes suffered an adverse employment action, *i.e.*, being placed on administrative leave by Cayuga Centers and his Employment Contract was terminated before the expiration of its term in June 2031.

127. Many aspects of Hayes's termination and mistreatment by Cayuga Centers and its Board give rise to inferences of disability and age discrimination. The combination of Hayes's then-age (72) and recent disability played a key role in Cayuga Centers' decision to fire Hayes when it did on specious grounds. This is evidenced by the discussions at the February 26, 2025 Meeting; the suspicious timing of the Board's decision; the Board's multiple false claims in the Second Nonrenewal Letter and Unlawful Termination Letter (the falsity of which is still more evidence of pretext); and the apparent belief of the Board and Lopez-Williams that Hayes could no longer perform capably as CEO and President of Cayuga Centers due to his physical condition, health, and/or age. Lopez-Williams appeared especially uncomfortable with Hayes's age and condition.

128. Cayuga Centers' violations of the NYSHRL § 296 and NYCHRL § 8-107 have caused Hayes both economic harm and significant physical and emotional distress.

31

19596345

## COUNT VIII:
## NYSHRL & NYCHRL[9] – RETALIATION
## (N.Y. EXEC. LAW § 296 & NEW YORK CITY, N.Y., CODE § 8-107)
### (Cayuga Centers)

129.   Hayes hereby incorporates and repeats the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

130.   Pursuant to  § 296 of the NYSHRL, "[i]t shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."  NYSHRL § 296(7).

131.   Likewise, pursuant to § 8-107 of the NYCHRL, "[i]t shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter, (iv) assisted the commission or the corporation counsel in an investigation commenced pursuant to this title, (v) requested a reasonable accommodation under this chapter, or (vi) provided any information to the commission pursuant to the terms of a conciliation agreement made pursuant to section 8-115 of this chapter."  NYSHRL § 8-107(7).

132.   Hayes participated in protected activities, to wit:  requesting FMLA leave and other reasonable accommodation from Cayuga Centers following his medical incident, so that he could

---

[9] *See* fn.6 *supra.*  The same holds true for retaliation claims.

19596345

get back to work without delay, and opposing the unlawful discrimination by Cayuga Centers on the basis of his age and disability.

133.    Hayes suffered an adverse employment action, *i.e.*, being placed on administrative leave by Cayuga Centers and his Employment Contract was terminated before the expiration of its term in June 2031.

134.    A causal connection exists between Hayes's protected activities and the adverse actions by Cayuga Centers.  Prior to Hayes's disability and related actions, Cayuga Centers was negotiating an amended Employment Contract with Hayes in which he would stay employed for at least a few more years.  Almost immediately after Hayes became disabled and sought reasonable accommodation from Cayuga Centers, all negotiations ended and Hayes was instead placed on administrative leave on false pretenses.  Before this, no major criticisms of Hayes's performance had been communicated to him by the Board.  This stark change of attitude and the temporal proximity to the onset of Hayes's disability (along with his age) are strong evidence of a causal connection between his disability, age, and protected activities, and the retaliation by Cayuga Centers.

135.    Cayuga Centers' violations of the NYSHRL § 296 and NYCHRL § 8-107 have caused Hayes both economic harm and significant physical and emotional distress.

**COUNT IX:**
**N.Y. LABOR LAW (LAB. LAW § 191 *ET SEQ.*)**
**(Cayuga Centers)**

136.    Hayes hereby incorporates and repeats the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

137.    Pursuant to N.Y. Lab. Law § 191, if "employment is terminated, the employer shall pay the wages [owed to the terminated employee] not later than the regular pay day for the pay

period during which the termination occurred, as established in accordance with the provisions of this section. If requested by the employee, such wages shall be paid by mail."

138.    Although Hayes's employment ended in June, as of the date of filing, he still has not been paid compensation owed to him by Cayuga Centers, such as his accrued PTO which should have been paid to Hayes by mid-July at the latest.  When Hayes was still working for Cayuga Centers, he was paid on a biweekly basis.

139.    Hayes and his counsel followed up with Cayuga Centers many times regarding these payments, which are not in dispute and are part of Hayes's normal salary and benefits, but to date the amounts have not been paid to Hayes.

**COUNT X:**
**BREACH OF CONTRACT**
**(Cayuga Centers)**

140.    Hayes hereby incorporates and repeats the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

141.    A valid contract existed between Hayes and Cayuga Centers, the Employment Contract.

142.    Hayes performed all material obligations under his Employment Contract

143.    Cayuga Centers breached the Employment Contract in multiple ways.  Not only did Cayuga Centers end the term of the Employment Contract early on invalid grounds, but it did not conduct the process correctly, as required by the agreement.  For example, § 11 of the Employment Contract required that Hayes be given an opportunity to address the Board in person prior to any adverse action being taken against him.  That request was denied by Lopez-Williams and counsel for the Board, who only allowed Hayes to submit a written response to the very serious accusation made against him and denied him access to necessary records.  The Board also breached the

34

19596345

Employment Contract when it placed Hayes on administrative leave without permitting him to address the Board at the highly irregular February 26, 2025 Meeting, in which Hayes's health, disability, and ability to do his job were heavily discussed outside his presence.

144.    Due to Cayuga Centers' breaches of contract, Hayes has lost wages and other compensation in an amount to be determined at trial.

**COUNT XI:**
**<u>DEFAMATION</u>**
**(All Defendants)**

145.    Hayes hereby incorporates and repeats the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

146.    On information and belief, in the last year, all the Defendants have made statements of fact regarding Hayes that were false and defamatory:

   a. Lopez-Williams made false and defamatory statements regarding Hayes's job performance, financial management of Cayuga Centers, and personal integrity both to other Board members and more generally within the local Auburn, New York community.

   b. Buffington, through B&H and D&M, made false reports regarding Hayes's use of federal funds and financial management of Cayuga Centers and the recent audits of Cayuga Centers.  Upon information and belief, the false reports against Hayes and related commentary were not driven by a legitimate desire to conduct a truthful audit and provide accurate information to Cayuga Centers and the Board.  Rather, the statements by Buffington, B&H, and/or D&M were intended solely to deflect blame from Buffington after B&H was acquired by D&M, which had different practices and policies with respect to these financial and accounting issues.

   c. Cayuga Centers and the Board, in turn, endorsed and republished the defamatory claims by Lopez-Williams, Buffington, and Rowe.

147.    These false and defamatory statements were published to third parties — Lopez-Williams made statements to other Board members, Cayuga Centers employees, and the local community; Buffington, B&H, and D&M made the false statements to the Board and Lopez-

35

19596345

Williams and perhaps more widely in the community as well; and Cayuga Centers and the Board have continued to disseminate these false reports to this day.

148.    Hayes is a private figure.  The Defendants acted with the applicable degree of fault because they were at least negligent, if not grossly irresponsible, with respect to their investigation and publishing of false and defamatory statements regarding Hayes.

149.    The statements made by Defendants are defamatory *per se* under New York law, but besides that, Hayes suffered special harm due to these false statements, including the loss of his job and reputation in the Auburn, New York community and severe emotional distress at a time when his health was already compromised.

## COUNT XII:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (All Defendants)

150.    Hayes hereby incorporates and repeats the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

151.    The actions of Defendants in conducting a malicious smear campaign against Hayes — a long-standing and highly respected employee of Cayuga Centers — in the immediate aftermath of his traumatic medical event, as alleged *supra*, was extreme and outrageous.

152.    Defendants engaged in this campaign with the intent of causing severe emotional distress to Hayes.

153.    Due to this misconduct by Defendants, Hayes suffered severe emotional distress. Not only did he lose his job and his standing in the local community was compromised while he was convalescing from an emergency surgical amputation, but Defendants' inexcusable actions (and consequent severe distress to Hayes) impeded Hayes's recovery from that surgery resulting in a serious infection that threatened the healing of his skin grafts if not worse.

36

19596345

## COUNT XIII:
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS
### (Lopez-Williams, Buffington, B&H, and D&M)

154. Hayes hereby incorporates and repeats the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

155. Hayes had a long-standing business relationship with Cayuga Centers, having worked there for close to three decades.

156. Defendants Lopez-Williams, Buffington, B&H, and D&M, as described above, each took numerous steps with the intent of interfering with Hayes's business relationship with Cayuga Centers. These steps appear to be motivated by personal animus and/or a desire to shift blame from themselves to Hayes.

157. Thus, Defendants' actions were taken for a wrongful purpose and were achieved through dishonest means, *i.e.*, false and disparaging comments regarding Hayes that were communicated to Cayuga Centers with the intent of pushing Hayes out of the organization and avoiding blame.

158. As a direct result of these actions by Defendants, Hayes was put on a punitive administrative leave and his Employment Contract was eventually terminated by Cayuga Centers, resulting in Hayes' loss of his salary and fringe benefits and causing severe emotional distress.

## JURY DEMAND

159. Hayes hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## DEMAND FOR RELIEF

160. Wherefore, Plaintiff Edward Hayes respectfully requests that the Court enter judgment in his favor as follows:

37

19596345

a. Declare that Cayuga Centers' actions violated the ADA, 42 U.S.C. § 12101 *et seq*.;

b. Declare that Cayuga Centers' actions violated the ADEA, 29 U.S.C. §§ 621-634;

c. Declare that Cayuga Centers' actions violated the FMLA, 29 U.S.C. § 2601 *et seq*.;

d. Declare that Cayuga Centers' actions violated the NYSHRL, N.Y. Exec. Law § 290 *et seq*.;

e. Declare that Cayuga Centers' actions violated the NYCHRL, New York City, N.Y., Code § 8-101 *et seq*.;

f. Declare that Cayuga Centers' actions violated the N.Y. Lab. Law § 19 *et seq*.;

g. Declare that Cayuga Centers' actions breached the Employment Agreement that existed between Hayes and Cayuga Centers;

h. Declare that all or some of the Defendants are liable in tort for defamation, intentional infliction of emotional distress, and/or tortious interference with business relations;

i. Award Hayes all compensatory damages, statutory damages, punitive damages, and other appropriate relief as permitted by law, including lost wages for the entire remaining term of the Employment Contract which ran through June 30, 2031;

j. Award Hayes his costs of bringing this suit, including all reasonable attorneys' fees and costs;

k. Award Hayes prejudgment and post-judgment interest on any monetary relief to be granted; and

l. Award all other relief to which Hayes may be entitled which the Court deems just and equitable, including reinstatement to his CEO position at Cayuga Centers.

DATE: November 7, 2025                              Respectfully submitted,

/s/ Jacqueline Meese-Martinez
Jacqueline Meese-Martinez (5514955)
Christina T. Hassel (*pro hac vice* to be filed)
Alexa R. Civittolo (*pro hac vice* to be filed)
HAHN LOESER & PARKS LLP
200 Public Square, Suite 2800
Cleveland, Ohio 44114
Phone: (216) 621-0150
Email: jmeese-martinez@hahnlaw.com
        chassel@hahnlaw.com
        acivittolo@hahnlaw.com

38

19596345

Peter M. Katsaros (*pro hac vice* to be filed)
HAHN LOESER & PARKS LLP
200 West Madison Street, Suite 2700
Chicago, Illinois 60606
Phone: (312) 637-3015
Email: pkatsaros@hahnlaw.com

*Counsel for Plaintiff Edward Hayes*

19596345